IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KATHERINE DOROTHEA WATSON, )<br>as Guardian for KORTNEY LaMON )<br>LEWIS, an incapacitated person, )<br>)<br>                 Plaintiff, )<br>)<br>vs. )<br>)<br>UNITED STATES OF AMERICA, )<br>)<br>                 Defendant. ) | No. CIV-04-537-C |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant's motion for summary judgment. Defendant contends that, under the undisputed facts in this case, it is entitled to summary judgment. The Court disagrees and denies Defendant's motion.

STANDARD OF REVIEW

Summary judgment is proper only if the moving party shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." See Adler v. Wal Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Id. (citing Anderson, 477 U.S. at 248). At the summary judgment stage, the Court's function is not to weigh the evidence and determine

the truth but to determine whether there is a genuine issue for trial. Willis v. Midland Risk Ins. Co., 42 F.3d 607, 611 (10th Cir. 1994).

When deciding whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. See Anderson, 477 U.S. at 255; Simms v. Oklahoma ex rel. Dep't of Mental Health, 165 F.3d 1321, 1326 (10th Cir. 1999). The Court may consider as evidence the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed. R. Civ. P. 56(c). The Court will not consider unsupported, conclusory allegations. See Harrison v. Wahatoyas, L.L.C., 253 F.3d 552, 558 (10th Cir. 2001).

## BACKGROUND

At approximately 10:31 p.m. on August 5, 2001, Kortney LaMon Lewis (Lewis), a prisoner, walked into the Health Services Unit (HSU) at FCI-El Reno. (Undisputed Fact ¶ 2.) Lewis was examined by physician's assistant, Michael England, who found that his airways were clear and his breathing and circulation normal. (Undisputed Fact ¶ 3.) However, Lewis was bleeding from a wound above his left ear. (Id.) England obtained Lewis's consent and sutured the wound. (Undisputed Fact ¶ 5.) During the approximately fifteen minutes it took to close Lewis's wound, England continued his evaluation of Lewis. (Undisputed Fact ¶ 6.) Lewis was orientated to person and place, but vague as to time. (Id.) Lewis did not remember what happened to him. (Id.)

After stopping the bleeding, England fitted Lewis with a cervical collar and referred him for further evaluation to Parkview Hospital, the nearest medical facility with x-ray and CT scan capabilities. (Undisputed Fact ¶ 8.) England called at home Dr. Barbara Malcher (Malcher), an FCI-El Reno physician, who consented and concurred in the referral. (Malcher Dep., Def.'s Exh.4, ¶ 17; Inmate Medical Assessment Form, Def.'s Exh. 5.) Lewis departed from the HSU and had cleared security to leave the institution by 11:20 p.m. (Undisputed Fact ¶ 11.)

Lewis was treated in the emergency room at Parkview Hospital. Lewis's intake notes indicate that he was wearing a cervical collar because officers wanted to check for a possible subdural hematoma. (Parkview Emergency Treatment Record, Pl.'s Exh. 3.) Lewis also underwent x-rays and a CT scan. (Id.) No subdural hematoma was identified (Radiology Report, Pl.'s Exh. 3.) Lewis was then transferred to St. Michael's at 3:38 a.m. (Id.) At 6:15 a.m., Lewis was again transferred to Norman Regional Hospital, where he arrived at 6:57 a.m. (Aug. 6, 2001, EMSA records, Def.'s Exh. 12.)

On August 6, Lewis had surgery for a depressed fracture of the skull. (Lewis's Medical Records, Pl.'s Exh. 11.) Lewis developed sensory aphasia, a loss or partial loss of the ability to speak or comprehend speech, and was transferred back to Parkview for speech therapy. (Id.); Webster's II New Riverside University Dictionary, 117. During the time Lewis was in the various hospitals, Dr. Malcher monitored his progress. (Undisputed Fact ¶ 18.) On August 13, Lewis's speech problems were re-evaluated and had not improved. (Rehabilitation Progress Note, Pl.'s Exh. 12.) According to Lewis's records, Lewis's speech

3

therapist was concerned that returning to FCI-El Reno would not be in Lewis's best interest if his speech deficits continued. (Id.)

Lewis was discharged on August 15, 2001, "after discussion with Dr. Malcher and instructions for continuation of speech therapy and occupational therapy to be continued at FCI." (Discharge Summary Report, Pl.'s Exh. 13.) The discharge summary report indicates that Lewis needed to continue "occupational and physical therapy because of problems with speech." (Id.) At the time of the transfer, Lewis was "in stable condition, improved with improving speech and dyslexia and aphasia." (Id.)

Upon arriving back at FCI-El Reno, Lewis was placed in the Special Housing Unit (SHU). (Undisputed Fact ¶ 19.)[1] He did not return to the general prison population. (Id.)

FCI-El Reno cannot house prisoners needing hospital care. (Undisputed Fact ¶ 13.) However, it operates its HSU to meet outpatient medical needs. (Undisputed Fact ¶ 14.) The HSU is staffed by physician's assistants, nurses, and paramedics from 6 a.m. to 10 p.m. daily.[2] (Undisputed Fact ¶ 15.) Inmates needing observation were placed in the SHU where

---

[1] Plaintiff asserts that this fact and several other facts asserted in Defendant's ¶¶ 19-22 are disputed and refers the Court to her response to ¶ 17. Nothing in Plaintiff's response to ¶ 17 contradicts these facts. The Court assumes, however, that Plaintiff intended to refer the Court to the response to ¶¶ 13-16. Thus, to the extent Plaintiff has presented evidence that controverts Defendant's statements, the Court will construe that evidence as a denial. However, all statements not controverted are deemed admitted. See LCvR56.1(c).

[2] Although the Health Services Manual for the Federal Bureau of Prisons required federal correctional institutions to provide 24-hour on-site medical care (Health Services Manual sec. 4, Pl.'s Exh. 5), FCI-El Reno was exempt from this policy because of the correctional staff's familiarity with CPR and the accessibility of institution and local emergency medical services. (May 3, 2001, Exemption; Def.'s Reply, Exh. 1.) Plaintiff

Case 5:04-cv-00537-C   Document 97   Filed 06/02/05   Page 5 of 10

they were observed by correctional officers 24 hours a day. (Jordan Dep., Pl.'s Ex.9, at 8-9.) According to Malcher, each inmate in the SHU is checked every 30 minutes. (Undisputed Fact ¶ 19.)

Lewis's prison medical records do not indicate that he was seen by medical personnel after his arrival back at FCI-El Reno until August 18. (Lewis Medical Records, Pl.'s Exh. 10; compare England Dep., Pl.'s Exh. 4, at 38 (stating that medical personnel would have made rounds in the SHU and that Lewis did not flag any of them down and make complaints).) On August 18, Lewis was found unconscious on his cell floor at 7:25 p.m. (Undisputed Fact ¶ 23.) England responded to a call from SHU and ran to assist Lewis. (Undisputed Fact ¶ 24.) Lewis was placed on a gurney and transferred to the HSU, where he and England arrived at 7:40 p.m. (Undisputed Fact ¶¶ 26, 28.) After arriving at the HSU, England called for an ambulance and continued to monitor and evaluate Lewis's condition. (Undisputed Fact ¶¶ 30-31.) During this time, England noticed Lewis's right pupil dilate to three times the size of his left pupil. (England Dep. at 68-69.) Once the medical personnel

---

objects to the Court's consideration of this evidence, arguing that Defendant failed to produce it in compliance with the discovery rules. (See Pl.'s Sur-Reply, Dkt. No. 86, at 1.) Plaintiff's argument is without merit. The relevant documents were produced well before the close of discovery and, according to Defendant, as soon as Defendant knew they were reasonably relevant to the issues in this case. (See Def.'s Resp. to Pl.'s Mot. for Sanctions, Dkt. No. 81.) Regardless, even if the documents were not timely produced, the Court finds that the failure was harmless. See Fed. R. Civ. P. 37(c)(1); Jacobsen v. Deseret Book Co., 287 F.3d 936, 952-53 (10th Cir. 2002) (listing factors relevant to determining whether failure to disclose discovery is harmless under Rule 37). Further, Plaintiff is not prejudiced by Defendant attaching the document to its reply since Plaintiff was permitted to respond in a sur-reply. See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1163 (10th Cir. 1998).

5

arrived, England overheard a correctional officer tell the ambulance staff that earlier in the afternoon, around 4 p.m., Lewis had trouble speaking and walking. (England Dep. at 46.) England admits that these signs suggested a strong likelihood that immediate neurosurgical intervention was needed. (England Dep. at 69-70; Undisputed Fact ¶ 38-40 (symptoms suggested intracranial pressure such as subdural hematoma that, if untreated, could lead to death).) Because he was attending to Lewis's medical emergency, England did not contact Malcher until after Lewis had left for the hospital. (Undisputed Fact ¶ 52.)

Lewis was transported to Parkview Hospital at 8:19 p.m. and arrived two minutes later. (Undisputed Fact ¶ 45.) At Parkview, Lewis was ventilated and underwent a CT scan then given a diuretic, Manitou, to alleviate the intracranial pressure. (Undisputed Fact ¶¶ 41, 46.) Once Lewis was stabilized, he was again transferred to Norman Regional Hospital for neurosurgery. (Undisputed Fact ¶ 48.) As a result of his subdural hematoma, Lewis is in a persistent vegetative state.[3] (Undisputed Fact ¶ 51.)

## DISCUSSION

Plaintiff's claims arise under the Federal Tort Claims Act (FTCA), which allows money damages for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). "The FTCA applies the law of the place where the alleged negligence occurred and makes the United States liable to the same extent as a

---

[3] Plaintiff refers to Lewis as living in a "minimally conscious state." Although there is potentially a medical difference in the two terms, it is not material at this stage.

private person under like circumstances." Wark v. United States, 269 F.3d 1185, 1187 (10th Cir. 2001). Because the acts of alleged negligence at issue in this case were committed in Oklahoma, the Court applies Oklahoma substantive law. See id.

*Medical Malpractice Claim*

In Oklahoma, a plaintiff claiming medical malpractice negligence must prove three elements: "(1) a duty owned by the defendant to protect the plaintiff from injury, (2) a failure properly to exercise or perform that duty, and (3) an injury to plaintiff proximately caused by the defendant's breach of that duty." Roberson v. Jeffrey M. Waltner, M.D., Inc., 2005 OK CIV APP 15, ¶ 5, 108 P.3d 567, 569. These elements must ordinarily be established through expert medical testimony. Benson v. Tkach, 2001 OK CIV APP 100, ¶ 10, 30 P.3d 402, 404.

It is less than clear which actions by England or Malcher Plaintiff is contending constitute negligence. Plaintiff fails to make any argument whatsoever on her malpractice argument, limiting the argument section of her brief to refuting Defendant's assertion of the "discretionary function" exception. Notwithstanding the lack of argument, the Court finds that Plaintiff has elucidated genuine disputes of material fact which prevent the entry of summary judgment.

Plaintiff's expert, Dr. John A. Coates, opines that the employees at FCI-El Reno were negligent in (1) failing to have a physician (or, presumably, any medical personnel) check in on and observe Lewis during the days following his release from the hospital, (2) failing to summon a physician after Lewis was found unconscious, and (3) failing to transfer Lewis

to a facility with neurosurgical capabilities. (Coates Report, Pl.'s Exh. 14, at 3-4.) The first two conclusions seem to be not inconsistent with England's deposition testimony, in which he indicates that the symptoms noted by the correctional officers (at 4 p.m. that afternoon) would have told him that it was "virtually certain that [Lewis] had a very serious subdural hematoma" and "something serious was going on." (England Dep. at 21, 23-24.) Thus, Plaintiff has demonstrated that a genuine issue of material fact exists whether the employees at FCI-El Reno adhered to the applicable standard of care in administering medical care to Lewis on August 18, 2001.

*Discretionary Function*

Defendant contends that Plaintiff is barred from asserting negligence based on England's selection of Parkview Hospital as the appropriate place to refer Lewis.[4] According to Defendant, this claim is barred by the discretionary function exception to the FTCA. See 28 U.S.C. § 2680(a). Defendant agrees, however, that the discretionary function does not give "medical personnel discretion to ignore the applicable standard of care." (Def.'s Reply, Dkt. No. 83, at 4.) Thus, the Court turns to Plaintiff's claim that, on August 18, England was negligent in failing to send Lewis to a hospital with neurosurgical capabilities.

The United States cannot be liable for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part

---

[4] Defendant also argued that Plaintiff was unable to assert a failure to train claim or a claim based on the institution's failure to have 24-hour medical care available. In the response, it does not appear that Plaintiff is alleging that these acts give rise to a claim of negligence.

of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). To determine if the discretionary function applies, the Court conducts a two-step inquiry. Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1166 (10th Cir. 2004). "First, the court asks whether the challenged action involves 'an element of judgment or choice.'" Id. (citation omitted). "Second, the court asks whether the government decisions are based 'on considerations of public policy.'" Id. (citation omitted).

The Urgent Care Procedures for FCI-El Reno state, "When the Health Services Unit cannot provide the necessary care and services required, the patient will be transferred via ambulance to Parkview Hospital." (Urgent Care Procedures, Pl.'s Exh. 6.) Defendant contends that the United States was exercising its discretion in enacting this policy. This choice, according to Defendant, was grounded in public policy because the close proximity of Parkview "reduced the costs of transport," "facilitated the provision of security outside the institution," and "[met] the medical needs of inmates requiring emergency treatment." (Def.'s Br., Dkt. No. 57, at 27.)

Plaintiff asserts, however, that in contrast to the FCI-El Reno policy, the policy directive from the Bureau of Prisons states that the first consideration in determining what outside hospital to which to send an inmate is the kind of facilities that are offered. (Pl.'s Br. at 13; England Dep. at 37.) England also testified that, if he knew then what he knows now, he might have called for an air ambulance. (England Dep. at 64-65.) Thus, the evidence is conflicting about whether the decision to send Lewis to Parkview was dictated by an

institutional policy or if it were left to England's discretion, and on what basis the decision was made. Accordingly, the Court defers resolution of this question until trial.

CONCLUSION

Defendant's Motion for Summary Judgment (Dkt. No. 57) is DENIED.

IT IS SO ORDERED this 2nd day of June, 2005.

ROBIN J. CAUTHRON
United States District Judge