IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KATHERINE DOROTHEA WATSON, )<br>as Guardian for KORTNEY LaMON )<br>LEWIS, an incapacitated person, )<br>                             )<br>            Plaintiff, )<br>                             )<br>vs.                          ) | No. CIV-04-537-C |
| UNITED STATES OF AMERICA,    )<br>                             )<br>            Defendant.       ) | |

## MEMORANDUM OPINION

On June 20, 2005, the Court commenced a three-day bench trial in this case. The testimony and exhibits introduced at trial painted a picture of the virtual destruction of a once-healthy young man's brain caused by a massive intracerebral hemorrhage. In stark contrast, the trial painted another picture of hope and brighter futures as this young man, Kortney Lewis (Lewis), makes remarkable progress because of his family's constant dedication to his rehabilitation. However, regardless of the emotionally compelling circumstances presented in this case, there is no legal basis for imposing liability on the United States. This conclusion is based on the following findings of fact and conclusions of law.

**Findings of Fact**

*Background*

1.      In August 2001, Kortney Lewis was an inmate at the Federal Correctional Institute in El Reno, Oklahoma (FCI El Reno).

2.      On August 6, 2001, Lewis underwent brain surgery at Norman Regional Hospital for a depressed skull fracture after being injured by another inmate. Lewis remained at Norman Regional Hospital for three days. Upon his discharge, Lewis's doctor indicated that Lewis was neurologically normal except for mild speech problems. Dr. Malcher, the Clinical Director at FCI El Reno, noted that her intent was to have Lewis ultimately transferred to a Federal Medical Center for ongoing speech therapy.

3.      Prison officials did not contact Lewis's mother, his next of kin, to notify her of Lewis's surgery. When Lewis's mother learned that Lewis was in the hospital, prison officials refused to let her visit Lewis. Further, throughout Lewis's medical treatment from August 5 through August 19, FCI El Reno did not keep Lewis's mother adequately informed of his condition and location. FCI El Reno's actions in this regard violated BOP Policy, which requires such disclosure and the "maximum opportunity for visitation."[1]

4.      After his discharge from Norman Regional Hospital, Lewis was transferred to Parkview Hospital in El Reno, to receive speech and physical therapy. Lewis remained at

---

[1] Although the Court acknowledges this violation of BOP policy, it recognizes that the violation is irrelevant to the question of medical negligence. Plaintiff has not established that the medical standard of care required notification of the next of kin or that the policy violation caused or contributed to Lewis's injuries in any way.

Parkview for approximately a week before he was discharged to return to FCI El Reno.[2] The discharge instructions from Parkview indicated that Lewis was to continue to receive speech and occupational therapy. There was no requirement for further observation, hospitalization, nursing care, or immediate medical follow-up.[3]

5. Upon his return to FCI El Reno, Lewis was placed in the Special Housing Unit (SHU). Dr. Malcher's testimony regarding Lewis's placement is inconsistent and inconclusive. She testified that she "might have" had Lewis placed in SHU, Lewis was placed in the SHU for better observation, and that custody made the decision to place Lewis in the SHU for protective reasons. However, it was the understanding of PA Michael England (England) that Lewis was placed in the SHU because of his involvement in a fight, which would be consistent with FCI El Reno's practice of placing an inmate in the SHU pending the outcome of the investigation into an altercation with another inmate. PA Thomas Jordan also indicated that it was policy to place inmates in the SHU upon their release from the hospital, sometimes for investigative or protective reasons, depending on the circumstances. There is a lack of paperwork indicating the reason for his placement in the SHU (which, as England testified, is contrary to the institution's common practice). The medical personnel testifying at trial all agreed that a non-inmate who underwent the same

---

[2] Although the discharge instructions indicate that Lewis's doctor at Parkview, Dr. Holy, spoke with Dr. Malcher prior to Lewis's release, there was no evidence introduced regarding the substance of this conversation.

[3] Lewis was, however, scheduled to have his stitches removed on August 23, two weeks after discharge by Dr. Alvis at Norman Regional.

surgery as Lewis would have been sent home within days of surgery, and the Parkview discharge instructions lack any instruction for further hospitalization or observation. The Court is unable to determine the true reason or reasons for which Lewis was placed in the SHU but finds that Plaintiff has not proven by a preponderance of the evidence that Lewis was placed in the SHU for observation.[4]

      6.      Medical personnel visit the SHU once daily to tend to any medical needs of any inmate housed in that unit, regardless of the reason for placement in the unit. Daily visits are necessitated by the solitary nature of the confinement in the SHU. During the visits, the medical personnel issue a "sick call" and may look in on the inmates through the doors to their cells, but do not necessarily speak with the inmates or make any more detailed observation of their medical needs. If an inmate does not indicate that medical attention is necessary, the medical personnel continue on rounds without stopping. Medical personnel visited the SHU on August 15, 16, 17, and 18, but Lewis did not request any medical assistance during their visits.

      7.      Dr. Malcher makes rounds in the SHU once a week. Although she made rounds on August 17, she did not check on Lewis or work with him on his speech or occupational therapy. Dr. Malcher was not scheduled to make rounds again in the SHU until August 24, nine days after Lewis was returned to FCI El Reno.

---

[4] Even if the Court were to conclude that Lewis were placed in the SHU for medical observation, it would not alter the Court's findings regarding causation. See Findings of Fact ¶ 28.

8.   Although Lewis was still slurring his speech and required further speech therapy, Lewis was able to complete sentences and communicate. On the evening of August 16, Lewis was interviewed regarding the alleged fight on August 5. Lewis was able to deny that he instigated a fight with another inmate and insisted that he was "waiting on the phone and the next thing [he] knew was that [he] woke up in the hospital." (Def.'s Exh. 21.)

9.   On the evening of August 18, guards escorting Lewis back from the showers noticed that Lewis was suffering from worsened slurred speech, difficulty completing sentences, and trouble walking. The correctional officers did not notify anyone at the Health Services Unit (HSU) of this change in Lewis's condition and placed Lewis back in his cell. The exact time Lewis returned from the showers was not established and the evidence presented to establish this fact was clearly hearsay.[5] The ambulance records indicate that Lewis was escorted back to his cell just shortly before he collapsed. The Parkview medical records indicated that this occurred *sometime* after 4 p.m. Further, the records at Norman Regional indicate that Lewis was taken back to his cell only a few minutes before he called out for help. These statements are not necessarily inconsistent, as a few minutes before 7:25 p.m. is also after 4 p.m. – thus, the Court finds that Lewis was returned to his cell a few minutes before 7:25 p.m.

---

[5] The hearsay was not objected to. Thus, the Court considers it for its truth, but is mindful of the inherent reliability problems in doing so.

10. After Lewis was returned to his cell, the officers heard him call for help. When the guards went to assist him, Lewis was lying unconscious on the floor of his cell. The correctional officers summoned England, from the HSU, for assistance at 7:25 p.m.

11. England was there within two minutes. England transferred Lewis to the HSU where the life-saving equipment was located. After arrival at the HSU, England called Parkview Ambulance Service, the closest ambulance service to the prison, as he was required to do by FCI El Reno Urgent Care policy upon finding an unresponsive inmate. Plaintiff did not establish that England could have called for an ambulance any sooner than he did at 7:42 p.m.

12. While waiting for the ambulance, England continued to observe Lewis for any changes in his condition. England did not, however, contact Dr. Malcher about Lewis's condition until after Lewis had left the prison.

13. The ambulance arrived at the prison within three or four minutes of receiving England's call, but it took approximately another ten minutes to clear security. The emergency crew arrived at the HSU at 7:56 p.m., where they proceeded to prepare Lewis for transport. This was the quickest any ambulance crew could have reached Lewis to begin transport to a hospital for services.

14. About the time that the emergency crew arrived, England noted that Lewis's left pupil had dilated to three times the size of his right pupil, a sign that his brain had herniated. Additionally, after the emergency crew began to prepare Lewis for transport, England and the emergency crew learned from the guards that Lewis had problems with

dysarthria (difficulty expressing thoughts into words) and ataxia (stumbling) while returning from the shower.

15. It took the ambulance crew about ten to fifteen minutes to prepare Lewis for transport, and several more minutes to clear security at the prison. The ambulance crew left the prison with Lewis at 8:19 p.m. and arrived at Parkview Hospital at 8:21 p.m. There is no evidence that any ambulance service, air or ground, could have left the prison any sooner than 8:19 p.m.

16. Parkview Hospital is located two minutes from FCI El Reno. Mercy Hospital is at least 20 minutes further away.

17. The decision regarding where to take Lewis was made by the ambulance crew, who are members of the trauma system. The decision was not made by England, although he presumed Lewis would be sent to Parkview Hospital.

18. Although the ultimate decision to send Lewis to Parkview was made by the ambulance service, there is no persuasive evidence that having Lewis sent to another hospital such as Mercy would have resulted in a more favorable outcome. Indeed, the more compelling evidence indicated that if Lewis had been sent to Mercy via ambulance, he likely would not have survived.

19. At Parkview, Lewis underwent a CT scan, which demonstrated that he had a large intracerebral hematoma, 66 millimeters in diameter, with a blood mass of 2 & 2/3 ounces. Lewis was given Mannitol 42 minutes after his arrival at Parkview emergency room. The Mannitol reduced the intracranial pressure and once stable, Lewis was transferred from

Parkview to Norman Regional Hospital for neurosurgery. The transfer occurred at 9:54 p.m. and was done via ground ambulance, not air ambulance. Plaintiff's expert, Dr. Coates, disagrees with some of the decisions made by Parkview, but agrees that Parkview's treatment was consistent with the appropriate standard of medical care.

20.     Norman Regional was the appropriate hospital to do Lewis's neurosurgery because that is where Lewis had his first surgery less than two weeks earlier. Lewis was admitted to Norman Regional at 11:07 p.m.

21.     Lewis underwent surgery to have the hemorrhage removed. After surgery, Lewis was diagnosed as being in a persistent vegetative state. His family, however, has refused to give up on him and spends approximately 50 hours a week with him, contributing to his care and rehabilitation. The doctors at trial agreed that Lewis is not in a persistent vegetative state, but a minimally conscious or severely disabled state. He continues to make significant strides in his level of functioning, which are attributable to the consistent care and work by his mother and other family members.

22.     Plaintiff's counsel's closing and reply briefs are full of speculation, misstatements, unwarranted assumptions, accusations, and vitriol, with the argument and revised proposed findings and conclusions based on evidence that was not introduced or a mischaracterization of that which was introduced. Because it would not be productive to explain the rejection of each of Plaintiff's proposed findings and conclusions, the Court rejects them in their entirety except where they are consistent with the findings and conclusions stated herein.

*Standard of Care*

23.     The most immediate medical needs at the time Lewis was found unconscious with his pupils dilated were to (1) identify the problem, (2) ensure that he was stable and in an environment prepared to handle a sudden change in stability, (3) give him Mannitol or a similar drug to reduce the intracranial swelling, (4) diagnose the source of the problem by having him undergo a CT scan, etc., and (5) conduct neurosurgery, if necessary.

24.     Each of the above medical needs were met. England clearly identified and understood the gravity of Lewis's symptoms, transferred Lewis to a location where lifesaving equipment was located, and contacted emergency services. Emergency services transported Lewis to the closest hospital where he could be stabilized, diagnosed, and receive the appropriate medication to reduce the swelling. Lewis was then operated on to have the hemorrhage removed.

25.     Lewis was discharged from Parkview Hospital on August 15 with no requirements for further observation, hospitalization, or nursing care. Accordingly, placing Lewis in the SHU, failing to conduct a baseline examination, or failing to instruct the correctional officers of possible symptoms to watch for, did not breach the standard of care.

26.     It was not a breach of the applicable standard of care for PA England not to give Lewis Mannitol. First, there was no Mannitol stocked at the prison. Although Plaintiff presented evidence that FCI El Reno violated BOP policy by failing to have a Local

Formulary,[6] this failure does not translate into a breach of the medical standard of care. Indeed, the evidence presented indicated that Mannitol is a drug not frequently used outside the hospital setting and Plaintiff has presented no evidence that the appropriate standard of care required FCI El Reno to stock a drug they did not regularly use. Second, England, a physician's assistant, was not qualified to administer Mannitol. Thus, the failure of Defendant to stock or give Lewis Mannitol did not breach the applicable standard of care.

27.  It was not a breach of the applicable standard of care for England to contact Parkview Ambulance services in lieu of an air ambulance. Parkview Ambulance service was two to three minutes from the prison and was familiar with the security protocols imposed by the prison. There was no ambulance service, ground or air, that could respond sooner. Further, there was no persuasive evidence presented that an air ambulance would have been available and willing to transport Lewis or any other incarcerated person.

*Causation*

28.  Lewis's intracranial hemorrhage was sudden and violent. It could not have been anticipated. More detailed visits by medical personnel during the "sick call" in the

---

[6] The National Formulary is a compendium of all drugs recommended as essential for patient care in the BOP, and Mannitol is one of those drugs. However, each institution may have a Local Formulary, which is a subset of the National Formulary indicating which drugs are actually stocked at the institution, based on the needs of the individual institution. The Local Formulary is required to be in writing to let "local prescribers" know what is available at the institution. Although it appears that FCI El Reno violated BOP policy by failing to have such a Local Formulary in writing, nothing about this violation necessitates a finding that they breached the applicable standard of medical care because (1) BOP policy recognizes that all drugs will not necessarily be needed at each institution, and (2) there is no evidence that FCI El Reno had a reason to anticipate that Mannitol would be needed at their institution – indeed, it has never been needed before or since August 18, 2001.

SHU or closer observation by correctional officers instructed in symptoms to watch for would not have prevented Lewis's hemorrhage because no symptoms could have been observed until a few minutes before 7:25 p.m. on August 18.

29.  Lewis's medical records indicate that he was given a three-day supply of Flexeril and a thirty-day supply of Dilantin.  Although the August 15 discharge instructions indicate that Lewis had suffered from "some sort of dyslexia . . . which, during the hospitalization, started improving remarkably," this is a far cry from being "unable to read" as Plaintiff asserts.  Further, there is no evidence that Lewis either did not take his medicine or took too much, or, if so, that a problem with the medicine could have contributed in any way to the hemorrhage.

30.  Defendant is not responsible for selecting where Lewis would be transported. The decision regarding where to transport Lewis was made by the emergency crew, who are members of the trauma system.  Thus, any breach of the applicable standard of care in the selection of where to send Lewis was not the result of any action by Defendant.

31.  *Even if* Defendant had a role in the selection of treatment facilities for Lewis, the evidence is clear that Lewis could not have been operated on before his brain herniated. The medical personnel arrived *after* Lewis's brain herniated.  There is no evidence that they could have arrived sooner.  Similarly, there is no evidence of a delay in contacting emergency personnel or a delay in conducting the security checks upon their arrival at the prison.  Additionally, *even if* Lewis could somehow have been transported immediately to a hospital such as Mercy, Lewis could not have been in surgery before his brain herniated

at 7:55 p.m. The evidence indicates that to diagnose his injury, administer Mannitol, and call in a neuro-surgery team would take, under the best of circumstances, an hour to an hour and a half after arrival at a Level 3 trauma hospital emergency room (like Mercy). Lewis's brain herniated 30 minutes after he went down unconscious in his cell.

32. Further, based on the location and size of Lewis's hemorrhage, it is not likely that any surgery conducted *after* Lewis's brain herniated, even if conducted sooner, would have resulted in a more favorable outcome. Based on Lewis's Glasgow coma scores upon arrival at Parkview Hospital, even Plaintiff's expert agreed, Lewis had at least a 90% chance of dying or living in a persistent vegetative state.

## Conclusions of Law

1. This Court has jurisdiction over this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), which allows money damages for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."

2. The FTCA does not waive the Government's sovereign immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

3. The decision by FCI El Reno to contact Parkview Ambulance Service for assistance when inmates are found unresponsive and in need of medical care above that able to be provided at FCI El Reno is governed by the discretionary function. 28 U. S.C. § 2680.

To the extent that the decision to contact Parkview Ambulance Service is not covered by the discretionary function, the Court finds that it was not negligent.

4.  "The FTCA applies the law of the place where the alleged negligence occurred and makes the United States liable to the same extent as a private person under like circumstances." Wark v. United States, 269 F.3d 1185, 1187 (10th Cir. 2001). Because the acts of alleged negligence at issue in this case were committed in Oklahoma, the Court applies Oklahoma substantive law. See id.

5.  In Oklahoma, a plaintiff claiming medical negligence must prove three elements: "(1) a duty owed by the defendant to protect the plaintiff from injury, (2) a failure properly to exercise or perform that duty, and (3) an injury to plaintiff proximately caused by the defendant's breach of that duty." Roberson v. Jeffrey M. Waltner, M.D., Inc., 2005 OK CIV APP 15, ¶ 5, 108 P.3d 567, 569.

6.  Health care providers employed by the United States have a duty to render medical care to the plaintiff consistent with the national standard of care. See 76 Okla. Stat. § 20.1.

7.  Plaintiff did not establish that health care providers at FCI El Reno breached the national standard of care in treating Lewis. Findings of Fact ¶¶ 23 to 27.

8.  To the extent the treatment of Lewis by health care providers at FCI El Reno did not comply with the national standard of care, such a breach was not the proximate cause of Lewis's intracerebral hemorrhage or his resultant loss of function. Findings of Fact ¶¶ 28

to 32; <u>see</u> <u>Elledge v. Staring</u>, 1996 OK CIV APP 161, ¶ 5, 939 P.2d 1163, 1165 (defining proximate cause).

    9.    Plaintiff has not proven her case of medical malpractice. Judgment will be entered in favor of the Defendant.

    DATED this 25th day of July, 2005.

*[signature]*
ROBIN J. CAUTHRON
United States District Judge